## UNITED STATES v. KUHL.

(District Court, S. D. Iowa, W. D. February 19, 1898.)

1. CRIMINAL LAW—REFUSAL TO SUBMIT CASE TO JURY—INDICTMENT.
Where, from the inspection of an indictment, it becomes clear to the court that, if a jury should find defendant guilty under the evidence on which it is conceded the government would be compelled to rely, a new trial would necessarily be granted, the indictment will be quashed.

2. SAME—COUNTERFEITING—SIMILITUDE OF OBLIGATION.
The "similitude" contemplated in Rev. St. § 5430, which makes criminal the having in one's possession, with intent to sell or use the same, "any obligation or security engraved and printed after the similitude of any obligation or other security issued under the authority of the United States," is such a likeness or resemblance as to be calculated to deceive an honest, sensible, and unsuspecting man of ordinary care and observation, when dealing with a supposed honest man.

3. SAME—SIMILITUDE OF OBLIGATION GENERALLY FOR JURY.
Under Rev. St. § 5430, a Confederate bank or other bill or note may have the similitude therein contemplated, and yet be neither forged nor counterfeit. It is generally sufficient if such note, in its grouping of vignette, engraving, promise to pay, figures denoting denomination, or in color or tint, bears a marked similitude to national currency. And this is ordinarily a question for the jury.

4. SAME—SIMILITUDE—CONFEDERATE NOTE.
An ordinary Confederate States five-dollar note does not bear to the national currency the "similitude" contemplated in Rev. St. § 5430, notwithstanding such notes are frequently accepted by mistake as money.

5. SAME—SIMILITUDE OF OBLIGATION.
Rev. St. § 5430, making it a crime for a person to have in his possession, with intent to sell or use the same, any obligation engraved and printed after the similitude of an obligation issued under authority of the United States, does not make the worthless character of the imitation, nor the intent to defraud by its use, material in constituting the crime.

On motion to quash indictment against Matthew Kuhl for having in his possession an instrument in the similitude of a bank note or bill of the United States.

Charles D. Fullen, U. S. Atty.

D. B. Dailey, for defendant.

WOOLSON, District Judge. The indictment is based upon that portion of section 5430, Rev. St., which provides that:

"Every person * * * who has in his possession or custody, except under authority from the secretary of the treasury or other proper officer, any obligation, or other security, engraved and printed after the similitude of any obligation or other security issued under the authority of the United States, with intent to sell or otherwise use the same, * * * shall be punished," etc.

The "obligation" with whose unlawful possession defendant is charged is shown by the indictment to be what is commonly known as a "Confederate States Note," the wording on its face being as follows:

"Two years after the ratification of a treaty of peace between the Confederate States and the United States, the Confederate States of America will pay to bearer five dollars.                                    H. Richmond, for Treasurer.
"February 17th, 1864."

The motion to quash, though containing various grounds, may be summed up in the last ground stated, which is:

"Because the instrument set out in the indictment is not in the similitude of any note, bank bill, obligation, or security of the United States, and the same is not calculated to impose or be put off upon any person as an instrument, obligation, or security resembling or in the similitude of any obligation of the United States."

Section 5413, Rev. St., declares that:

"The words 'obligation or other security of the United States' shall be held to mean all bonds, certificates of indebtedness, national currency, coupons, United States notes, certificates of deposit, bills, checks or drafts for money, drawn by or upon authorized officers of the United States, stamps and other representatives of value, of whatever denomination, which have been or may be issued under any act of congress."

The instrument whose terms are set out in the indictment has been submitted to the court on the argument of the motion to quash, and is in all general respects similar to the Confederate States notes or bills whose appearance is familiar to the public generally.

The point first to be determined is as to the contention of the district attorney that "whether the note is in the similitude of any obligation of the United States" is a question to be submitted to the jury, and cannot be raised or determined in the manner now attempted. The general proposition that the determination of the facts in a case is for the jury cannot be disputed. But, if carried to its extreme, this proposition would forbid the court to instruct a jury to return a verdict for the defendant in any case where evidence is introduced. Under this view, the court must send the case to the jury, even when the evidence is so slight as that the court, on its conscience, could not sustain a verdict of guilty, but would be compelled, if such verdict were returned, to set it aside immediately, and order a new trial. The district attorney would not, and does

85 F.—40

not, urge this extreme view. The practice in this district is, so far as I am informed, in harmony with that in all other districts. When the government has failed to present such a case against a defendant as would, upon a verdict of guilty, satisfy the conscience of the court, I have not hesitated to direct a verdict of not guilty. In such a case, if a verdict of guilty were allowed to stand, the court must pass sentence. And will any judge permit himself to be placed in the position of imposing sentence when satisfied in his conscience that the evidence does not and cannot sustain such a verdict? I am not considering a case where the jury, by discrediting one line of testimony or one set of witnesses, and holding credible another line or set, may find a verdict of guilty. In this last supposed case there is a conflict of evidence, which is rightly submitted to the decision of a jury. But where there is no such conflict, where reasonable men cannot differ, but must come to the same conclusions as to the facts, I know of no good reason why the judge may not—why the judge should not—direct a verdict of not guilty, when these facts cannot sustain the opposite verdict. Surely, in this respect, where the liberty of a defendant is involved, the court ought, with regard to a verdict of not guilty, to be as free to act in directing such a verdict as in cases where a man's property rights only are involved. And there can be no difference of opinion as to the duty of the court in a civil action when the plaintiff's pleading fails to state a cause of action, or when the evidence submitted must lead all reasonable men to a verdict against plaintiff.

In Rosen v. U. S. (decided January 27, 1896) 161 U. S. 29, 42, 16 Sup. Ct. 434, 439, the court say:

"It has long been the settled doctrine of this court that the evidence before the jury, if clear and uncontradicted upon any issue made by the parties, presented a question of law, in respect of which the court could, without usurping the functions of the jury, instruct them as to the principles applicable to the case made by such evidence."

In Sparf v. U. S., 156 U. S. 51, 99, 15 Sup. Ct. 273, the court say:

"If there are no facts in evidence bearing upon the issue to be determined, it is the duty of the court, especially when so requested, to instruct them as to the law arising out of that state of the case. So, if there be some evidence bearing upon a particular issue in a cause, but is so meager as not, in law, to justify a verdict in favor of the party producing it, the court is in the line of duty when it so declares to the jury."

In Railway Co. v. Gentry (decided May 18, 1896) 163 U. S. 365, 16 Sup. Ct. 1104, Mr. Justice Harlan, in delivering the unanimous opinion of the court, says:

"If, looking at all the evidence, and drawing such inferences therefrom as were just and reasonable, the court could have said, as matter of law, that the plaintiffs were not entitled to recover, an instruction to find for the defendant would have been proper."

It is true that the extract just quoted from the latest deliverance of the supreme court on this matter was given in a civil case. But, with reference to its application to a criminal case, we may use the language of the supreme court in Sparf v. U. S., supra, with reference to cases there cited at the conclusion (page 100, 156 U. S., and page 292, 15 Sup. Ct.) of the extract above given from that case:

"The cases just cited were, it is true, of a civil nature; but the rules they announce are, with few exceptions, applicable to criminal cases, and indicate the true test for determining the respective functions of court and jury."

The circuit court of appeals for this circuit have also stated the rule applicable to this matter. In Sipes v. Seymour (decided August 24, 1896) 40 U. S. App. 85, 22 C. C. A. 90, and 76 Fed. 116, that court, speaking through Circuit Judge Sanborn, say:

"The direction to the jury to return a verdict for the defendants was therefore right. It is the duty of a trial court to direct a verdict for the defendants, when the evidence is such that, in the exercise of a sound judicial discretion, it would be compelled to set aside a verdict returned in favor of the plaintiff."

In Marshall v. Hubbard, 117 U. S. 415, 419, 6 Sup. Ct. 806, the supreme court were reviewing a verdict for the defendant, wherein the circuit court, in directing such verdict, used this language, as quoted on page 417, 117 U. S., and page 806, 6 Sup. Ct.:

"I think, therefore, that, upon the proofs, the case is within the rule laid down by the supreme court of the United States, namely, that the court can now see * * * that, if the jury were to render a verdict against the plaintiff, it would have to set that verdict aside. If that be so, the court ought not to hesitate in directing a verdict."

In approving this action of the circuit court, the supreme court say (page 419, 117 U. S., and page 806, 6 Sup. Ct.):

"Giving the defendant the benefit of every inference that could have been fairly drawn from the evidence, written and oral, it was insufficient to authorize a verdict in his favor. Such being the case, a peremptory instruction for the plaintiff was proper."

In the case just cited, it is true that the direction for a verdict was given at the close of the evidence. Such direction—verdict for plaintiff—could not have been given when plaintiff rested in chief. But had the evidence at that point been insufficient, within the rule just quoted, to have sustained a verdict for plaintiff, a motion to direct verdict for defendant must have been sustained. And why may not the same reasoning be applied on the pending motion to quash the indictment?

In Pleasants v. Fant, 22 Wall. 116, 122, Justice Miller was considering the argument that, instead of a direction for a verdict, the court should await the verdict, and then set it aside if it was unsupported by evidence, having stated (page 120):

"As was said by this court in the case of Improvement Co. v. Munson, 14 Wall. 448, recent decisions of high authority have established a more reasonable rule,—that in every case, before the evidence is left to the jury, there is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

—The learned justice, after stating the general "duty of a court in its relation to the jury to protect parties from unjust verdicts," etc., proceeds (page 122) to say:

"In the discharge of this duty, it is the province of the court, either before or after the verdict, to decide whether the plaintiff has given evidence sufficient to support or justify a verdict in his favor; not whether, on all the evidence, the preponderating weight is in his favor,—that is the business of the jury,—but, conceding to all the evidence offered the greatest probative force which, accord-

ing to the law of evidence, it is fairly entitled to, is it sufficient to justify a verdict? If it does not, then it is the duty of the court to set it aside, and grant a new trial. Must the court go through the idle ceremony in such a case of submitting to the jury the testimony on which the plaintiff relies, when it is clear to the judicial mind that, if the jury should find a verdict in favor of plaintiff, that verdict would be set aside and a new trial had? Such a proposition is absurd, and accordingly we hold the true principle to be that if the court is satisfied that, conceding all the inferences which the jury could justifiably draw from the testimony, the evidence is insufficient to warrant a verdict for the plaintiff, the court should say so to the jury."

May we not, varying the terms of the argument as applied to the present question, adopt its forceful presentation in the Pleasants Case to the pending question? Here there can be no rightful verdict against defendant unless the evidence shall prove the "similitude" to which section 5430 relates. The instrument or "obligation" on which the indictment is based is now submitted to the court, as it would necessarily be submitted, on defendant's objection to its introduction on the trial of the case. If, then, this "evidence on which plaintiff relies," and which is the essence of its case, makes it "clear to the judicial mind that, if" upon it "a jury should find a verdict in favor of plaintiff, that verdict would be set aside, and a new trial had," "must the court go through the idle ceremony of" impaneling a jury, for the purpose of submitting the case to it? Let it be noted that no evidence which the government could introduce could change the conclusion necessarily to be reached if the "similitude" to which the statute relates, and charged in the indictment, does not exist in fact. Why, then, if such "similitude" does not exist, proceed to the useless task of calling a jury into the box, and introducing the evidence, which in advance is recognized will, and can only, result in a verdict of not guilty? I am here considering this point of practice, without now deciding the question of fact, as to whether the "similitude" charged in case at bar to exist actually does exist. If the "obligation" set out in the indictment be such as to raise in the mind of the court even a doubt as to its similitude, then the question should be submitted to the jury. But if there be no similitude, within the construction of that term which the court must give to the statute, in its charge to the jury, then the court should promptly act, and sustain the motion to quash the indictment. Since then the court could not sustain a verdict of guilty in such a case.

The indictment charges the defendant with having in his possession, "with the intent to use, the said obligation, by uttering and passing the same as and for a lawful and proper obligation and security of the United States." This "obligation," as submitted to the court on the hearing of the motion to quash, is a plain and ordinary five-dollar "note," purporting to be issued by the "Confederate States of America." The government does not charge the note to be false, forged, or counterfeit. The indictment treats this note as a genuine instrument. The note being genuine, the question for immediate consideration is whether it is an "obligation or other security engraved and printed after the similitude of any obligation or other security issued under the authority of the United States." Its general shape and size resemble the currency known as ordinary

national bank notes, and also that known as greenbacks and silver certificates, issued by the government. In so far as the note in question bears on its face a vignette and other engraving similar to those found on the face of the above-described national obligations of the United States, it may be said to have to that extent a similarity to such national obligations. But it will not do to lay down the broad rule that, whenever the similarity just stated exists, there therefore exists a "similitude" such as the statute contemplates; else all bank notes heretofore issued under state statutes will be found to be obnoxious to the provisions of the statute, and such a holding would prohibit the use of all such bank notes. The framers of the statute could not have thus intended. When we look at the note in question, we find a broad band across one end of its face, whereon the word "Five" appears in large letters. On its face the words "The Confederate States of America" appear in large letters; indeed, in such a position, and so plainly placed, as that they constitute the most prominent feature of its face. There is, in vignette, in engraving, in lettering, in fact in the detail of the face of the note, no special resemblance whatever to the notes or bills "issued under authority of the United States." (It is not claimed that the note in question is in the similitude of any other "obligation or security" issued under authority of the United States.") If the note in question is obnoxious to the statute, then all "bank notes," as that term is generally understood, issued by state banks, and in the form heretofore commonly used, are obnoxious.

It is urged, however, that notes like that in question are frequently accepted by persons as money, and as being genuine national currency, and that this fact therefore proves such notes to be in "similitude" of national currency. I cannot accept this as proof of the fact as claimed. If this contention be sustained, I see no escape from the conclusion that bank notes generally come within the provisions of this statute; and surely this cannot be claimed. Congress did not attempt or intend to prohibit and make criminal the issuance of bills by banks, wherever authorized to issue same by state law. To construe the statute as thus claimed would make the possession by the officers of such bank of its own bank notes a crime under such statute. The bank has in its possession, with intent to use,—that is, to circulate,—its own bank notes. If they resemble, as bank notes generally resemble, the national currency to the extent above specified as to the note in question in this case, then the mere possession by the bank officials of such bank of the bills of their own bank, which they intend to put into circulation, would make these officials criminal, under the federal statute. A construction leading to this result ought not to obtain, unless imperatively compelled by the terms of the statute.

There may, however, occur such resemblance in the grouping of vignette, of engraving, of the printed or engraved promise to pay, of figures, etc., denoting denomination of the note, of color or tint, either in the note originally or added by hand,—of many or all of these,— as to readily place the note in such similitude to national currency as

to make proper the submission to the jury of the fact whether the similitude contemplated by the statute exists. And where the court shall perceive such similitude, or be in doubt as to whether the same exists, 'in such case the court would submit the question to the jury for their decision under proper instructions. Neither of the two extreme constructions of the statute should be followed. The one extreme would bring before the court practically the entire paper circulation issued under state statutes by the banks of the country. The other extreme would compel, before conviction could be had, such a close and minute resemblance to national currency as to compel acquittal in nearly every case presented. Between these two extremes lies the safe course.

In U. S. v. Wilson, 44 Fed. 751, Judge Hallett was considering a motion to quash the indictment where the defendant was indicted, under section 5415, Rev. St., for passing a counterfeit note. The note there in question was a genuine note, purporting to have been issued by the Confederate States of America. After remarking that the note then in question "bore some general resemblance to the treasury notes and national bank notes of the United States," and that "it was put off upon an ignorant man, in the nighttime, and without much examination on his part," Judge Hallett says: ¬

"The question which arises upon this motion is whether this can be called a counterfeit note, as having any likeness or similitude to the treasury notes and bank notes in general circulation; and I am of opinion that it cannot be recognized as having that character."

U. S. v. Stevens, 52 Fed. 120, is cited by the district attorney as enforcing his view that the question of similitude in these cases is for the jury, and not for the court. In that case the note in question was shown by the evidence to be "a genuine note of the Bank of Mecklenburg, N. C., a state bank, which, during its existence, had issued its obligations as lawful currency, but which had become utterly insolvent, leaving its circulating notes unprovided for and worthless." In passing upon a motion to direct a verdict of not guilty, Judge Paul states:

"The question presented to the court for its decision is, is the having in possession, without authority from the secretary of the treasury or other proper officer, with intent to sell or otherwise use the notes of a bank, the said notes being worthless, but engraved and printed after the similitude of a United States treasury or national bank note, a violation of the provision of the statute cited?"

It is not perceived wherein, under the provisions of the statute cited, it is in any wise material whether the bank is insolvent or its notes worthless. The statute does not make the worthless character of the note an essential, nor does it declare that the intent to defraud is material. Apparently, a solvent bank may not rightly issue, nor its officers safely have in their possession, notes of that bank, intended to be used as money, and which are "in similitude" of treasury or national bank notes. In the Stevens Case, apparently the bank note under consideration bore marked similarity to the treasury or national bank notes, as shown in the statement by Judge Paul, above quoted, of "the question presented to the court"; and therefore the action of the court is in accordance with the views hereinbefore expressed, when he declares (page 121):

"The question as to the similitude of the note alleged to have been passed by the defendant to the treasury or national bank notes or other obligations of the United States is a question to be determined by the jury."

U. S. v. Sprague, 48 Fed. 828, is cited in the brief of the district attorney. That was a case where Judge Dyer, of the Eastern district of Wisconsin, in 1882, was considering a motion for new trial, the defendant having been convicted under said section 5430, Rev. St. The "fraudulent imitation of United States bonds," for whose possession the defendant had been committed, was an obligation of "the United States Silver Mining Company, of Denver, Colo." Under the statements contained in the opinion, this "fraudulent imitation of United States bonds" must have possessed such similitude of the genuine obligations of the United States as to have satisfied the court in that respect. The "bond" there in question did not bear the signature or purported signature of any person, though spaces were left thereon for signatures of the president and secretary. The motion for new trial was granted, on the ground that, while in that unsigned condition, it was "not an obligation or security at all, within the meaning of the statute." In the opinion, Judge Dyer refers to and quotes from an unreported charge to a jury, given by Judge Caldwell, when sitting as district judge in the Eastern district of Arkansas, in the case of U. S. v. Wilson. The district attorney has furnished me with a manuscript copy of that charge. In this manuscript copy, the offense for which Wilson was on trial is stated to be "passing counterfeit United States bond," although a portion of the charge appears to apply specially to the portion (quoted above) of section 5430, Rev. St., under consideration in the case at bar. So far as that charge bears on the question now under consideration, the charge of Judge Caldwell is as follows:

"(1) If you find from the evidence that the defendant had in his custody or possession any obligation or other security engraved and printed after the similitude of interest-bearing coupon bonds of the United States, with intent to sell and otherwise use the same for the purpose of defrauding, you will find him guilty. (2) If you find from the evidence that the defendant, with like fraudulent intent, passed, uttered, published, or sold, or attempted to pass, utter, publish, or sell, a false, forged, or counterfeit United States interest-bearing coupon bond, you will find him guilty. (3) If you find the bond which the defendant uttered and passed has such a resemblance to any of the securities of the United States mentioned in the information as to be calculated to deceive persons of common or ordinary observation, then he is guilty as charged in the first count of the information, and you should so find. To constitute the offense under that count, it is not necessary the similitude between the false and the true security should be such as to deceive bank officers, experts, or cautious men with good eyes or a microscope. The offense is made out when the similitude or resemblance or likeness is such as may be calculated to enable one desiring to perpetrate a fraud to palm off on an honest, sensible man, of ordinary observation and experience, the false security as a genuine security. The law does not require the citizens generally to possess a technical knowledge of the laws of the United States relating to her securities, such as the frame, form, size, color, terms of, and signatures to United States bonds. And it does not follow that the defendant is not guilty if it appears by careful examination of the alleged fraudulent bond that it does not purport to be a bond of the United States, but, on the contrary, when so examined, appears or purports to be a bond issued by some mining company. Does the fraudulent bond bear such a likeness or resemblance to any of the genuine bond securities of the United States as to be calculated to deceive an honest, sensible, and unsuspecting man of ordinary care and observation, dealing with a supposed honest man? If it does, then the similitude required by

the statute to make out the offense exists. Men are not required to carry with them magnifying glasses or counterfeit detectors, and put them in use every time they have a business transaction; nor are they required to act upon the supposition that every man with whom they have a business transaction is a forger or thief."

In this charge, the learned judge (who now honors the United States circuit court of appeals of this circuit as its senior judge) concisely presents a clear and practical test, which is applicable in the case at bar:

"Does the fraudulent bond bear such a likeness or resemblance to any of the genuine bond securities of the United States as to be calculated to deceive an honest, sensible, and unsuspecting man of ordinary care and observation, dealing with a supposed honest man? If it does, then the similitude required by the statute to make out the offense exists."

This construction of the statute assumes the "sensible man" is exercising "ordinary care and observation" with regard to the bond or note tendered him. If the note were printed on the brown wrapping paper, in common use in the stores for wrapping up goods purchased, or on highly-colored paper, or with such arrangement of vignette and printed or engraved matter and the like as manifestly not to bear similitude to the genuine treasury or national bank notes issued under the authority of the United States, so that such "sensible and unsuspecting man," if "exercising ordinary care and observation," must and would readily observe this lack of similitude, then the note does not come within the statute quoted. In applying the test so clearly laid down by Judge Caldwell, "there is," in the language of Justice Miller in Pleasants v. Fant, supra, "a preliminary question for the judge." And, if the note offered by the government as the basis for its prosecution clearly and manifestly has not the similitude which this test provides, the judge presiding at the trial could not permit a verdict of guilty to stand, but must direct a verdict of acquittal. And where the note, as presented to the court on argument of a motion to quash the indictment, could not sustain a verdict of guilty, the motion to quash should be sustained. In this case, I conclude, after inspection of the note, that the Confederate five-dollar note, as presented herein, is not printed and engraved with such similitude to what is commonly known as "national currency" (whether issuing directly from the treasury or from national banks) as to justify a verdict of guilty under the section above quoted.

The conclusion here reached does not leave the public without remedy in cases like that here presented. As clearly shown by Judge Hallett in U. S. v. Wilson, supra, the courts of the state are fully competent to deal with the question:

"The offense which this man committed in putting out this note was recognized at the common law as cheating. * * * The offense was that of cheating, and it was by a false symbol or token. The token was the note, and the putting it off upon another as money was the precise offense of cheating at the common law. It was imposing upon another, inducing him to believe that the paper which was offered him was in fact money, when it was not. * * * The defendant offered the prosecuting witness the Confederate note as money. He made him believe it was money, and got change from him upon that understanding, and thereby cheated and defrauded the prosecuting witness of the money."

The same general suggestions are contained in U. S. v. Sprague, supra. Same opinion is given under heading of U. S. v. Williams, 14 Fed. 550, wherein it is said (page 552):

"Of course, the defendants cannot be prosecuted in this court on the ground that they are confidence men, or that they have attempted to perpetrate a fraud. Their prosecution must proceed wholly under the statute, and their conviction must rest wholly upon proof of the charge that they unlawfully had in their possession an obligation made after the similitude of an obligation of the United States."

The statutes in force in Iowa, as enacted by the lawmaking power of this state, contain abundant provisions for the conviction and punishment of the defendant, if guilty of intentionally passing Confederate notes as good money. And we may well leave to the state courts the duty of apprehending and punishing those guilty of cheating and defrauding the citizens of this state in the manner above suggested. Criminal statutes are inelastic. The court may not attempt to stretch the statutory provisions beyond their legitimate boundaries; and especially may the federal court decline thus to press the statute, where the state statutes are fully sufficient and competent to take jurisdiction of the offense. "The object of the provision of the statute under which this indictment is framed is, manifestly, to preserve the integrity of the national treasury and bank note currency, and to prevent the imposition on the public of worthless notes or obligations of any kind purporting to be the genuine obligations of the United States." U. S. v. Stevens, supra. Adopting the course pursued by Judge Hallett in the Wilson Case, supra, "this offense may be prosecuted under the statutes of the state if the state authorities are inclined to pursue it; and we will turn over the defendant to the state authorities, if they want him for that purpose." The motion to quash the indictment must be sustained. I will, however, delay entering formal order on this holding until the district attorney and the state authorities shall have had reasonable time to consider the course desired to be pursued. I may adopt this course without injury to the defendant, since he is out on bail.