UNITED STATES v. BARRETT.

(District Court, D. North Dakota. November 4, 1901.)

1. COUNTERFEITING—UTTERING INSTRUMENT IN SIMILITUDE OF GOVERNMENT OBLIGATION—CONFEDERATE NOTES.

The passage of a Confederate bill as money is not a violation of the fourth clause of Rev. St. § 5430, which makes it an offense for any person, except under authority of a proper officer, to have in his possession "any obligation or other security engraved and printed after the similitude of any obligation or other security issued under the authority of the United States, with intent to sell or otherwise use the same"; but, to constitute a violation of such provision, the instrument used must in its inception have been intended to simulate some obligation or security of the United States. The general likeness which one form of paper money bears to another is not sufficient.

2. SAME—USE OF INSTRUMENT TO PERPETRATE CHEAT.

The use as money of an instrument which does not possess the requisite similitude to some national obligation or security to perpetrate a common-law cheat is not an offense against the United States, but is solely within state authority.

On Motion to Quash Indictment.

P. H. Rourke, U. S. Atty., and Edward S. Allen, Asst. U. S. Atty. Newton & Smith, for defendant.

AMIDON, District Judge. The defendant is charged in the indictment with the violation of that provision of section 5430 of the Revised Statutes which reads as follows:

"Every person who has in his possession or custody, except under authority from the secretary of the treasury or other proper officer, any obligation or other security, engraved and printed after the similitude of any obligation or other security issued under the authority of the United States, with intent to sell or otherwise use the same, shall be punished," etc.

The instrument which is the ground of the prosecution is a facsimile of a Confederate bill of the denomination of $50, a copy of which is set out in the indictment. The defendant moves to quash the indictment upon the ground that it does not charge any offense against the laws of the United States. In support of the motion

it is urged that neither Confederate bills nor the facsimile mentioned in the indictment were criminal in their inception, nor intended to simulate any security or obligation of the United States, and that the passing of such an instrument at most would amount only to the offense which was known at common law as a cheat by means of a false token, and that such an offense is solely within state authority. On the part of the government it is contended that a violation of the statute in question is made out if the instrument bears such a likeness to any of the genuine obligations or securities of the United States as to be calculated to deceive an honest, sensible, and unsuspecting man, of ordinary care and observation, dealing with a supposed honest man, and that whether this Confederate facsimile bears such a likeness is a question of fact for the jury. At the hearing of this motion the instrument which is the subject of the indictment was submitted to the court for its consideration. It is in the usual form of Confederate bills, except that near the bottom thereof, and in type somewhat smaller than the rest of the instrument, are the words "Confederate facsimile." The authorities on the subject presented by the motion are not harmonious, and the case calls for a careful consideration of the statute and the circumstances under which it was passed.

The first clause of section 5430 covers the unauthorized use of plates made and owned by the government for the printing and engraving of its obligations. Clauses 2 and 3 cover in general the unauthorized making, selling, or having in possession of plates in the similitude of those used by the government. Clause 4, the one in question in this suit, seems to cover only such instruments as are the product of the unauthorized use of the lawful plates of the government specified in clause 1, or of the unlawful plates specified in clauses 2 and 3. The earlier statutes on the same subject point plainly to this interpretation. The first federal law dealing with the matter embraced in section 5430 is contained in section 19 of the act incorporating the second United States Bank, found in 3 Stat. 275. It reads as follows:

"And be it further enacted, that if any person shall make or engrave or cause or procure to be made or engraved, or shall have in his custody or possession, any metallic plate engraved after the similitude of any plate from which any notes or bills issued by the said corporation shall have been printed with intent to use such plate or to cause or suffer the same to be used in forging or counterfeiting any of the notes or bills issued by the said corporation; or shall have in his custody or possession any blank note or notes, bill or bills, engraved or printed after the similitude of any notes or bills issued by said corporation with intent to use such blanks or cause or suffer the same to be used in forging or counterfeiting any of the notes or bills issued by the said corporation; * * * every such person being thereof convicted," etc.

It will be noticed that the clause which corresponds to clause 4 of section 5430 relates only to blank notes or bills. The reason for this will be found in the other provisions of the act, which required that all such notes and bills before their issuance should be signed and countersigned by the proper officers of the corporation. The notes when they came from the plates were blank as to

signatures. It is manifest, therefore, that the clause which corre-
sponds to the clause in question in section 5430 was intended to
cover only the output of the forbidden plates mentioned in the
first part of the section or similar blank instruments wrongfully
obtained from the bank before they were signed by the proper
officers. In Act Oct. 12, 1837, authorizing the issuance of treasury
notes, the provision above quoted from the act incorporating the
United States Bank was copied with only such immaterial changes
as were necessary to adapt it to government obligations. It con-
tinued to be thus copied in each of the subsequent statutes au-
thorizing the issuance of treasury notes. See 5 Stat. 201, § 11; 9
Stat. 118, § 10; 11 Stat. 257, § 13. The last reference is to Act
Dec. 23, 1857, which was a revision of previous statutes on the
subject of treasury notes, and is frequently referred to in later en-
actments. Section 13 of that act reads as follows:

"And be it further enacted, that if any person shall make or engrave, or
cause or procure to be made or engraved, or shall have in his custody and
possession any metallic, plate engraved after the similitude of any plate
from which any notes issued as aforesaid shall have been printed, with
intent to use such plate, or cause or suffer the same to be used in forging
or counterfeiting any of the notes issued as aforesaid, or shall have in his
custody or possession any blank note or notes engraved and printed after
the similitude of any notes issued as aforesaid, with intent to use such
blanks or cause or suffer the same to be used in forging or counterfeiting
any of the notes issued as aforesaid, * * * every such person being
thereof convicted," etc.

In the first act authorizing the issuance of greenbacks, being
Act Feb. 25, 1862 (12 Stat. 345, § 7), this section was expanded
so as to assume nearly the same form as section 5430 of the Re-
vised Statutes. The clause in question, however, still dealt only
with "blank note or notes, bond or bonds, coupon or coupons, or
other security or securities." This was the form of expression
in all previous laws to which reference has been made. The rea-
son for it will be found in the other provisions of the statutes, which
required all treasury notes to be "signed in behalf of the United
States by the treasurer thereof, and countersigned by the register
of the treasury." It will, therefore, be seen that the obligations
of the government when they came from the plates were blank,
and that the clause of the statute in question was designed to cover
only such blank instruments. In the course of the Civil War, how-
ever, the treasury notes and obligations of the government came
to be issued in such vast volume that it was found to be wholly
impracticable to have each of them signed by the hand manual of
any officer of the treasury department. For this reason the prac-
tice of using engraved signatures was adopted. Section 6 of the
Act of June 30, 1864, reads as follows:

"And the treasury notes and United States notes authorized by this act
shall be in such form as the secretary of the treasury shall direct, and shall
bear the written or engraved signatures of the treasurer of the United
States and the register of the treasury, * * * and shall bear as a
further evidence of lawful issue the imprint of the seal of the treasury
department, to be made under the direction of the secretary of the treasury
as before directed." 13 Stat. 220, c. 172.

Owing to this change as to the manner of signature, a corresponding change was made in section 11 of this act of June 30, 1864, which has since become section 5430 of the Revised Statutes. The word "blank" is omitted, for the reason that the instruments, when they came from the plates, contained the engraved signatures of the proper officers of the treasury department. The scope of clause 4, however, was not enlarged, and in the act of June 30, 1864, as in previous acts, it was intended to cover only such instruments as are the output of the plates mentioned in the earlier provisions of the section. Notwithstanding this meaning of the statute, as evidenced by its history, it has sometimes been held that clause 4 was intended to reach all instruments bearing such a general similitude to federal obligations as to make them fit means of deception. U. S. v. Fitzgerald (D. C.) 91 Fed. 374; U. S. v. Stevens (D. C.) 52 Fed. 120; U. S. v. Wilson (D. C.) 44 Fed. 751, quoted in U. S. v. Kuhl (D. C.) 85 Fed. 631. That cannot be the proper construction of the statute, for several reasons: First. By its express language it relates only to such instruments as are "engraved and printed" in the similitude of government obligations. The engraving and printing is the only feature which the language of the section covers, and the only feature which, as the history of the statute demonstrates, it was intended to cover. Second. If the clause be expanded to cover any instrument made in the similitude of any government security or obligation, then it embraces the same subject as is covered by the next preceding section of the act, which has since been distributed into sections 5414 and 5431 of the Revised Statutes. This section dealt fully with counterfeits, and covers all such instruments, as to their making, possession, and transfer. But what is a counterfeit? It is, an instrument falsely made in the similitude of a genuine instrument. If the clause in section 5430, therefore, relates to all instruments bearing a similitude to any obligations of the government, it must necessarily cover counterfeits of those obligations. Under this construction section 10 of the act (sections 5414 and 5431 of the Revised Statutes) would completely cover the subject of counterfeit instruments, and section 11 of the same act (section 5430 of the Revised Statutes) would likewise cover the same subject; the one section uses the generic term "counterfeit" and the other section, under this construction, uses the distinctive words of the definition of that term, "made after the similitude of." It is therefore manifest that, if clause 4 be held to cover any instrument bearing a similitude to any government obligation or security, it exactly duplicates the earlier provision of the same statute. Third. The words "sell or otherwise use," found in the fourth clause of section 5430, are peculiar, and seem to have been employed to distinguish the instruments covered by that statute from counterfeit or altered obligations of the government. The words of transfer properly applicable to the latter class of instruments had become words of art. They appear in section 5431 of the Revised Statutes and in all earlier laws dealing with this subject from the beginning of the government. They are "pass, utter, publish, or sell." This difference of

language points clearly to a difference of subject-matter. The word "use" probably finds its full significance in the earlier statutes on the same subject, where the language is "with intent to use such blank or blanks or suffer the same to be used in forging or counterfeiting any of the notes issued as aforesaid." The word "sell" is intended to cover the transfer of these imperfect obligations as they come from the plates, and not their passage or utterance as counterfeit instruments. Fourth. Section 10 of the act of 1864 (which has since become sections 5414 and 5431 of the Revised Statutes, as already explained), deals with the subject of counterfeit instruments. To constitute the possession of such instruments a crime, the possessor must be actuated by a criminal intent in two particulars—First, he must have the intent to defraud; second, he must have the intent to pass, publish, utter, or sell the instrument. It will be noticed, however, that an intent to defraud is no part of the offense created by clause 4 of section 5430. Why this difference, unless there is a difference in the instruments dealt with? It is not reasonable that congress intended to make the mere possession of an instrument, engraved and printed in the similitude of some obligation or security of the government, a crime, without proof of any fraudulent intent on the part of its possessor, and at the same time and by the same statute require proof of an intent to defraud, to make the possession of a counterfeit instrument a crime, unless there is such a difference between the instruments themselves as to make mere possession in the one case evidence of a wrongful purpose which in the other case would not be indicated by such possession.

The construction thus justified both by the history of the statute and its language is proven to be correct by other considerations. To hold that the statute forbids the use of any instrument which bears such a likeness to the obligations of the government as to make it a ready means of cheating would render criminal the use of any currency other than that authorized by the United States; for all forms of paper money will necessarily bear a general similitude to each other. The promise to pay inscribed upon them will be substantially the same. The words and figures indicating their face value must in all cases be their most prominent feature, as these alone are chiefly observed in their actual use. All such instruments must further contain such markings and vignettes and be printed on such paper as to make their counterfeiting difficult. As a rule persons passing and receiving paper currency look only at the figures which express its value. They do not read the writing nor study the vignettes. If the instrument has the general appearance of paper money, and is for the intended amount, it is accepted. I am informed by the treasury department at Washington that the various instruments issued under authority of the national government which are now in circulation as money bear approximately 100 different designs. The most common devices are pictures of distinguished men of the republic and reproductions of famous paintings. These various issues of currency are engraved upon paper ranging through all the colors reasonably fit for the

purpose, and have, of course, acquired still other shades by the stains of actual use. Now of this great variety of paper money two things may safely be said—First, the ordinary business man neither knows nor observes their distinctive designs; second, no paper currency could be made reasonably fit for circulation which would not bear, in general, a close similitude to one or more of the 100 different varieties now in use under national authority. To hold, therefore, that the statute forbids the use of any instrument which bears such a similitude to any of the national securities as to make it a fit means of deception would necessarily make criminal the use of any paper currency except that authorized by the general government. But it can easily be shown that this was not the intent of congress in passing section 5430. First. Instead of prohibiting the use of state bank currency, the national government imposed a tax of 10 per cent. upon its circulation. The act prescribing this tax was approved on March 3, 1865, nearly a year after the act of June 30, 1864, was passed, from which section 5430 was taken. The very form of this restriction by taxation clearly shows that congress contemplated as lawful the continued use of the state bank currency. Second. On the 1st day of July, 1864, the day after section 5430 took effect as a law, the amount of state bank notes which were in actual circulation was $179,157,717. A year later, on the 1st day of July, 1865, the amount of this state bank currency in actual circulation was $142,919,638. On July 1, 1876, 12 years after this criminal law took effect, there was in actual use, of this paper currency, $1,047,335. (See Report of Monetary Commission of 1898, page 549.) Now, even a casual inspection of the currency issued by the state banks will show that it bore quite as close a similitude to the national securities as the instrument complained of in this action. It certainly bore such a similitude to the national currency as to make it an easy means of deception. It necessarily follows that if the use of this state bank currency was not within the prohibition of section 5430 the instrument set out in the indictment cannot constitute a violation of that statute. My attention has been called by the government to certain newspaper clippings relating to recent prosecutions of parties for passing certain of the notes of the State Bank of New Brunswick, N. J., and it appears from these clippings that some of those prosecutions have resulted in convictions. It is difficult, however, to see how such convictions can be sustained. At the time section 5430 became a law the use of the notes of that bank certainly was no violation of its provisions, and there has been no change either in the notes or the statute since that time to justify any different holding now. If the notes of the New Jersey bank have become worthless, and were used by the parties for the purpose of perpetrating a common-law cheat, or what is known under modern statutes as obtaining money or property by false pretenses, that offense is solely within state authority. U. S. v. Wilson (D. C.) 44 Fed. 751; U. S. v. Kuhl (D. C.) 85 Fed. 624. It should never be overlooked that the cheating is no part of the violation of section 5430. The similitude of the engraving and printing on the instrument used to the

engraving and printing upon national securities is the sole ground of criminal liability under the federal statute. Neither the worthless character of the instrument nor the intent to defraud are elements of the offense. If a person were to sell or otherwise use an instrument within its prohibition, and at the same time expressly declare its character, his act would come as clearly within the provisions of the statute as if done clandestinely. It is likewise true that the instrument might be as valuable as the genuine instrument in the similitude of which it was engraved, and still the defendant would be guilty, if it was engraved in the similitude of a security or obligation of the United States. Third. At the present time and at all times since the passage of the act of June 20, 1864, at points in this country within 100 miles of the national boundary line, Canadian paper currency has found a considerable circulation. An examination of any of these bills will show that they bear such a likeness to the paper currency of this country as not to be distinguished by the general public in the ordinary transactions of business. It is a matter of common knowledge that they are frequently passed and received as American money. If the construction contended for by the government be adopted, every person who has in his possession a Canadian bill, with intent to sell or otherwise use the same, is guilty of a crime; for the fact that the bill is worth its face is wholly immaterial under the statute. The fact that for more than 25 years no prosecution was ever instituted for the use of state bank or Canadian bills furnishes convincing proof that the construction now urged by the government is wholly unwarranted.

The only conclusion, it seems to me, which can be drawn from the history of the statute and from the considerations above adverted to is that, to bring an instrument within the provisions of the clause of section 5430 under consideration, such instrument must, in its inception, have been engraved and printed with an intentional design to simulate the engraving and printing upon some obligation or security issued under the authority of the United States. Something more than general appearance or adaptability to deceive is required. The court must be satisfied that the instrument in its inception was designed to be in the similitude of the engraving and printing upon some United States obligation or security. In other words, the similitude must not be simply incidental, and such as arises from the fact that the instrument in question was intended to subserve the same purpose as some obligation or security of the United States, but must be specific and direct and such as arises out of an intentional design to copy such obligation or security of this government. Of course I do not mean that, in prosecutions for the violation of this statute, it is incumbent upon the government to prove by extraneous evidence that the instrument complained of was originally designed to simulate some obligation or security issued under the authority of the United States. The instrument itself is to be looked at, and if it bears such a similitude to the obligations of the government as to indicate that it was designed to simulate those obligations, or even

if it should bear such a close resemblance as instruments usually do which are intended to simulate the obligations of the government, although the resemblance were accidental, the offense would be made out. But that incidental similitude which arises from the fact that the instrument complained of was intended to subserve the same purpose as national obligations and securities is not sufficient to make its possession a crime, if, in its inception, the instrument was lawful.

It follows that the indictment charges no offense, and the motion to quash must therefore be granted.